IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 28, 2005 Session

## WAYNE MICHAEL FULLER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 71745     Mary Beth Leibowitz, Judge**

_____

**No. E2004-02276-CCA-R3-PC - Filed November 4, 2005**

_____

The petitioner, Wayne Michael Fuller, appeals the Knox County Criminal Court's denial of post-conviction relief. His post-conviction petition attacked his 1998 guilty-pleaded convictions and sentence for seven counts of statutory rape and one count of contributing to the delinquency of a minor. The petitioner received maximum two-year sentences for each statutory rape conviction and 11 months, 29 days for the contributing to the delinquency of a minor conviction. The court ordered five of the statutory rape sentences to be served consecutively, resulting in an effective sentence of ten years. The post-conviction petition, amended on multiple occasions, alleged ineffective assistance of trial and appellate counsel and violations of *Blakely v. Washington* and of the petitioner's right against self-incrimination. The post-conviction court denied relief, and we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Mark Stephens, District Public Defender; and John Halstead, Assistant District Public Defender, for the Appellant, Wayne Michael Fuller.

Paul G. Summers, Attorney General & Reporter; Kathy D. Aslinger, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The relevant facts leading up to the petitioner's guilty pleas and sentencing appear in this court's opinion in the petitioner's direct appeal. *See State v. Wayne Michael Fuller*, No. E1999-01676-CCA-R3-CD (Tenn. Crim. App., Knoxville, Aug. 16, 2000).

Wayne Michael Fuller, 44 years old at the time of sentencing, resided in Jacksonville, Florida. During the late summer months of 1997, the defendant met AW, a 15 year old female, in a chat room on the internet. AW lived in Knoxville, Tennessee with her parents. The defendant's internet relationship with AW progressed to the point that in October 1997, he traveled to Knox County to meet AW. Unknown to her parents, AW met with the defendant and spent most of that particular weekend with him. No sexual activity occurred on this visit.

The defendant returned to Florida, and he continued to correspond with AW through the internet. In December 1997, the defendant again traveled to Knoxville, picked up AW, and took her to a Super 8 Motel in Knox County. On that occasion, the defendant engaged in sexual activity with the minor victim; he penetrated her vagina with his finger, and he performed oral sex on her. The defendant ultimately was charged with two counts of statutory rape arising from his actions during that visit.

On January 3, 1998, the defendant returned to Knoxville. He took AW to the same motel where he penetrated the minor digitally and performed oral sex on her, as the defendant had done in December. On this occasion, the defendant also placed his penis in her mouth. The defendant's actions during the January visit resulted in three counts of statutory rape.

The last time the defendant met with AW before his arrest was in early February 1998. He came to Knoxville, took AW to the Super 8 Motel, and twice penetrated her vagina with his finger. Two additional counts of statutory rape resulted from that encounter. AW's father had learned about the February meeting, and the father contacted law enforcement officers. The officers located the defendant and AW at the Super 8 Motel. The officers found alcohol in the room. The defendant had been drinking, and he had provided alcohol to AW.

The defendant entered guilty pleas to the resulting seven counts of statutory rape and the one count of contributing to the delinquency of a minor. The defendant did not have a plea agreement with the state, and the state made no sentencing recommendation when the defendant pleaded guilty. At the sentencing hearing, the state presented testimony from Knoxville polygraph examiner, Jim Morris, and from Helen Legall, a Gainesville, Florida law

enforcement officer. These witnesses recounted admissions made to them by the defendant that he had engaged in other inappropriate conduct involving minors and that he had a "fetish" for young girls.

The defendant's stepfather, a retired captain with the Hialeah Police Department, testified that what the defendant had done was wrong but that he had suffered. The stepfather was concerned that if his stepson were incarcerated, the defendant's two children who lived with their mother would suffer financially and have to apply for state aid. The stepfather agreed that the defendant definitely has a problem with minor females, that he needs counseling, and that the defendant probably cannot control his behavior.

Neither the defendant nor the victim testified at the sentencing hearing. The trial court had available to it the presentence investigation report on the defendant. The report concluded that the defendant appeared to be a high risk candidate for probation. The report also noted that the defendant had called the presentence investigator to ask about transferring his supervision to Colorado should he move there. The defendant told the presentence investigator that he had been checking the internet and that Colorado's requirements for supervising sex offenders seemed to be more lax than the requirements in either Tennessee or Florida.

*Wayne Michael Fuller*, slip op. at 2-3.

In the post-conviction evidentiary hearing, the state called the petitioner's appellate attorney who identified the briefs filed on appeal and the corresponding opinion of this court on direct appeal from the original guilty-pleaded convictions. Appellate counsel had previously served as a contract appellate defender for the Public Defender's Conference, and he estimated having filed approximately 30 to 40 state appellate briefs in criminal cases and numerous federal briefs.

Counsel testified that he was appointed to represent the petitioner on direct appeal. Counsel explained that he reviewed the record on appeal and spoke with the petitioner's trial counsel regarding potential issues for appeal. Counsel volunteered that until the post-conviction hearing, he had neither met the petitioner in person nor spoken to him directly; their communications had been through "extensive correspondence." From his investigation, counsel determined that "two pretty good issues" existed for appellate review. The first issue was whether the trial court erred in sentencing the petitioner to the maximum sentences within his applicable Range I offender classification. The second issue challenged the trial court's imposition of partial consecutive sentences.

Counsel was asked about oral arguments, and he recalled that the state constantly referred to the petitioner as a "sexual predator." He also recalled eliciting a "laugh" from one of the members of the panel hearing the case. Counsel explained that although he was successful on the petitioner's behalf with one of the issues raised, the panel affirmed the petitioner's effective 10-year sentence.

One of the petitioner's grounds for relief alleged that appellate counsel was ineffective in failing to challenge the imposition of consecutive sentencing pursuant to the opinion in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000). Counsel recalled that the opinion in *Apprendi* was released only a few days before oral arguments in the petitioner's case. Counsel candidly explained that he made no effort to raise *Apprendi* because basically he was unaware of the decision, but at any rate counsel did not believe *Apprendi* would have applied even if raised because the petitioner was not sentenced outside the statutory range for each offense.

Additionally, the petitioner cited counsel's failure to raise the question of disproportionate sentencing. Counsel testified that he was uncertain to what the petitioner was referring, but the consecutive sentencing aspect of the petitioner's case had been raised and pursued on appeal. Counsel believed that he had adequately researched the question of consecutive sentencing, and counsel disagreed with the petitioner's contention that the appellate court was required to, but did not, remand the case for resentencing.

On cross-examination, appellate counsel was shown a transcript of the sentencing hearing wherein the trial court referenced Code section 40-35-115(b)(5) as supporting consecutive sentencing. That section provides,

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and the victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims.

Tenn. Code Ann. § 40-35-115(b)(5) (2003). Appellate counsel agreed that the trial court did not specifically discuss or mention the factors set forth for consideration and agreed that he did not address that failure on appeal.

Appellate counsel was also questioned about the requirement that the petitioner submit to a polygraph examination and psychological evaluation prior to sentencing. Counsel recalled that damaging information had been elicited from the petitioner during the examination and evaluation, and it appeared to counsel to be a matter of concern to the appellate panel. The issue was not raised at sentencing or on appeal, however, and the appellate panel did not address the matter in its opinion.

The petitioner testified in support of his bid for post-conviction relief. He explained that he pleaded guilty without an agreement – "a blind plea to all seven counts on the felony charges and the one misdemeanor count." He was sentenced July 21, 1999, and based on "good time" credits, he had served approximately seven and one-half years of his 10-year sentence.

The petitioner testified that when he was arrested, he was in room 125 of the Super 8 Motel off of Campbell Station Road in Knox County. He was with AW, and she heard a vehicle pulling up outside the room. AW moved the curtain to look out the window, and she reported to the petitioner that a police car was outside. The petitioner testified that he told AW, "Well, you'd better go to the bathroom and get dressed." An officer knocked on the door and said, "Open up or we'll break the door down." In response, the petitioner opened the door, and a uniformed Knox County Deputy entered the room and asked for AW. The petitioner indicated that she was in the bathroom, at which point the deputy began handcuffing the petitioner. According to the petitioner, the deputy advised him of his rights and asked if the petitioner wanted to make a statement. The petitioner testified that he told the deputy, "No, I want an attorney."

The deputy placed the petitioner in the back seat of a patrol car and then began searching the motel room. After other officers arrived, AW was escorted to another patrol car and questioned. At one point, an officer approached the petitioner with a consent-to-search form and requested permission to search the petitioner's rental vehicle. The petitioner gave his permission and signed the form. The petitioner testified that the form referred only to the vehicle, not the motel room, but officers searched the room anyway. Later, AW's parents arrived, and everyone departed except the first officer who waited until transportation arrived to take the petitioner to the county intake facility. The petitioner said that the only thing he was told at that time was that he was being charged with contributing to the delinquency of a minor.

The petitioner related that he went through the booking process and was then escorted to a location with wall telephones. He called his stepfather who told the petitioner that he would arrange to have bond posted on the contributing to the delinquency of a minor charge. As the petitioner was being escorted to a cell, he asked the jail officer when he would be released once the bond was posted. The petitioner testified that the officer advised him that there was a "hold" on him and that he would not be released. The following morning, the petitioner again contacted his stepfather; the stepfather confirmed that the bond had been posted. In light of the "hold," the petitioner sent a note to Officer Darrell Johnson "to let him know that I wanted to talk to him so that I could get out of jail." The petitioner received no response, and the following Monday he sent another note to Officer Johnson. That same day, Officer Johnson arranged to interview the petitioner.

The petitioner testified that he initially denied any sexual activity with AW, and as the interview progressed, Officer Johnson became "upset" with the petitioner's denials. The petitioner described what happened next in the following fashion.

And [Officer Johnson] referred to an incident which occurred in October where the alleged victim and myself had met at a motel in north Knoxville where all we did was remove our tops and – and passionately kiss. He said, "You expect a jury to believe that you did that but that no sexual activity occurred?" He slammed his pad on [his] lap, got up out of the office and left.

Afterward, I believe it was Mike Grissom who came in the office, and he began appealing to my emotions. He told me –

At that juncture, the court sustained the state's hearsay objections such that the petitioner simply testified that he continued the interview but admitted that something had occurred. Approximately three days later, the petitioner's parents arrived from Florida and posted bond on the statutory rape charges, after which the petitioner returned to Florida.

The petitioner hired local Knoxville counsel to represent him and estimated that he met with counsel eight or nine times. The petitioner maintained that he asked counsel to file a motion to suppress his statement given to the police on the basis that he "was basically coerced into confessing," but counsel never did so. The petitioner further maintained that counsel should have investigated the circumstances of his arrest and realized that search and seizure issues existed based on the petitioner's warrantless arrest at the motel.

Regarding his motivation to plead guilty, the petitioner said that the state had offered to dismiss all except three of the statutory rape charges for which the petitioner would receive a sentence of six years if he pleaded guilty. The petitioner said that he rejected the offer based on counsel's advice and belief that the petitioner would not receive a jail sentence. The state made no other plea offers, and the petitioner testified that counsel later changed his assessment about a jail sentence and advised the petitioner that he "would probably have to do split confinement." Ultimately, counsel recommended that the petitioner enter a blind plea and "throw [himself] at the mercy of the court." The petitioner said that he followed counsel's advice.

After pleading guilty, the petitioner met with the presentence investigator to provide preliminary information. Shortly before the sentencing hearing, the petitioner was then told that he had to submit and pay for a polygraph examination and a psychological evaluation. The petitioner said that the testing was never before mentioned to him, and when he called counsel about the matter, counsel relayed that "the Judge had screwed up at [his] plea hearing and – and forgot to order it." According to the petitioner, counsel never discussed the testing, never discussed prior sexual history with the petitioner, and did not accompany the petitioner to the testing.

The petitioner did not fare well on the polygraph examination. Among the questions asked was whether, since becoming 20 years old, he had engaged in sex with any minors and whether he had lied to the examiner in any of his answers. The examiner told the petitioner that the results were not "good," and the petitioner asked to retake the test because he had recalled a "few

-6-

other" incidents. The results from the second testing were also not "good." When the petitioner asked to take the test a third time because he recalled one other incident, the examiner refused. Ultimately, the examiner testified at the petitioner's sentencing hearing regarding the petitioner's inculpatory statements during the examination.

After the examination, a sentencing hearing date was scheduled. The petitioner and his parents traveled from Florida for the hearing, but when they arrived, the petitioner's counsel informed them that the hearing had been reset. The petitioner returned to Florida, where he was contacted soon afterwards by a police officer about obscene phone calls. The petitioner was interviewed by the officer, and he was later arrested. The Florida officer appeared at the petitioner's sentencing hearing in Tennessee and testified that the petitioner confessed to having a fetish for a young girl. At the post-conviction hearing, the petitioner denied ever making such a statement. The petitioner said that he also alerted trial counsel that he did not make that statement, but trial counsel "didn't seem to care" and "didn't want to investigate the facts and circumstances."

After the petitioner was sentenced, trial counsel withdrew from further representation, and appellate counsel was appointed. The petitioner testified that he communicated that counsel should "specifically concentrate" on consecutive sentencing because the court had not made the requisite findings.

In terms of trial counsel's ineffectiveness and the decision to plead guilty, the petitioner complained that a motion to suppress his statement should have been filed. He claimed that the only reason he initiated interrogation after earlier invoking his right to counsel was because the police had a "hold" on him, which prevented him from making bond. He maintained that counsel was unwilling to file a suppression motion because the police would "just get up on the stand and lie." However, had the motion been filed and litigated, the petitioner testified that he would not have pleaded guilty as he did.

The petitioner said that another motion that counsel should have filed would have been to dismiss the arrest warrants based upon lack of probable cause. One possible challenge could have been that the petitioner was arrested for contributing to the delinquency of a minor, a misdemeanor that was not committed in the officer's presence. The petitioner admitted that he did not raise the issue with counsel. He said that he was not aware of the legal significance and that it was counsel's responsibility to investigate his case.

The petitioner was critical of counsel for not investigating and discussing with the petitioner his past sexual history. The petitioner claimed that had he known prior to his pleas that the information would come out at sentencing, he would have insisted on proceeding to trial. He clarified this claim by explaining that what he was told was that the testing "would be used to implement a treatment plan should [he] be granted probation"; he added, however, that he "was never advised that the information would be used against me in sentencing."

The petitioner was also critical of counsel for not accompanying him to the polygraph examination and not advising the petitioner of his right against self-incrimination in connection with the testing. As for the sentencing testimony of the officer from Florida, the petitioner insisted that the officer "lied," and if counsel had investigated the matter, counsel could have moved to suppress the officer's testimony, resulting in "a reasonable probability that [he] would have received a sentence much less than ten years."

The petitioner related that he also asked counsel to seek judicial diversion[1] and that after sentencing, he wanted counsel to object to a "disproportionate and arbitrary sentence." By disproportionate and arbitrary sentencing, the petitioner indicated that he was referring to the opinion in *Apprendi* that his appellate counsel should have raised. The petitioner also complained that his 10-year sentence for "little Class E felonies" was excessive.

The petitioner summarized counsel's performance as being a "constructive denial of counsel" because counsel "was present, but he didn't do very much of anything." Indeed, the petitioner proposed that trial counsel and prosecution counsel conspired to continue the first sentencing hearing date. He surmised that the attorneys were giving the police in Florida a chance to complete their investigation and "extract from [him] some more information from [him] that they could use against [him] at sentencing" in Tennessee. The petitioner also maintained that prosecution counsel leveraged trial counsel to "tank [his] case."

On cross-examination, the state questioned the petitioner to ascertain his theory of defense had he proceeded to trial. He said that his defense would have been "mistake in fact" based on the victim being an untruthful "delinquent" who lied to the petitioner about her true age of 15 years. The petitioner admitted that he met the victim through the internet, but he pointed out that he could not have been forced to testify at trial. He assumed that the state would have called the victim to testify at trial and that she would have told the jury (a) that she was 15-years old and that the petitioner was 43-years old; (b) that she met the petitioner on the internet and that he arranged for them to meet in Knoxville; (c) that she and the petitioner met at motels on more than one occasion; and (d) that when the arrest occurred, the victim was inside the motel room, her brazier was in the floor, alcohol was present, and she had consumed some of the alcohol. The petitioner also conceded that he would have expected the victim to testify at trial that they had engaged in sexual acts. Based on the anticipated testimony, the petitioner reaffirmed a defense based on the victim being an untruthful delinquent. The petitioner believed that trial counsel could have elicited from the victim that she initially admitted to the police that she told the petitioner that "she was sixteen and then fifteen."

In terms of the victim's anticipated trial testimony regarding the number and type of encounters with the petitioner, the state inquired whether the information was accurate. The

---

[1] During cross-examination, the petitioner withdrew his complaint that trial counsel had failed in not pursuing judicial diversion on his behalf. He conceded that after he got into trouble in Florida, before his sentencing hearing in Tennessee, trial counsel would have had little success in asking the trial court to impose judicial diversion.

petitioner responded, "I'm not saying that, no." The state pressed, "It is true?" At that point, the petitioner balked about the relevance of the question and retorted that his ineffective assistance of counsel claim did not turn on his guilt or innocence. He further lectured prosecution counsel that in the context of a guilty plea, he only had to show that he would not have pleaded guilty but would have insisted on going to trial. The state continued to press about the outcome had he gone to trial, to which the petitioner claimed that his sentence "certainly wouldn't have been as harsh." At that point, the following exchange took place:

> Q    Okay. And you don't think that a jury would have believed the truth, that you met with her on three occasions in Knoxville at a motel and had sex with her?
>
> A    If my – if my confession had been suppressed, who knows? I can't – I can't make a prediction as to what a jury would decide.
>
> Q    Well, you're saying here that it was the truth and that if she testified to that – those things she would have been telling the truth, right?
>
> A    But it would have been my lawyer['s] duty to convince a jury otherwise. Sure, she would have been telling the truth. But would the jury have believed her? We can't answer that question.

On cross-examination, the state explored with the petitioner his assault charge in Florida. After the petitioner posted bond in Tennessee and returned to Florida, he began making telephone calls to an 11-year-old girl and telling the girl, in more vulgar terms, that he wanted to rub his penis on her vagina. The petitioner testified that he did not know that the girl was 11 years old; he said, "I couldn't tell how old she was by talking to her on the phone."

The state asked the petitioner about his preliminary hearing. He admitted that trial counsel handled the hearing well; trial counsel was able to extract from the victim an admission that everything that occurred was consensual, thereby decreasing the petitioner's liability from forcible rape to statutory rape.

The state also asked whether trial counsel ever discussed the possibility that the sentences could be ordered to run consecutively. At first, the petitioner testified that he was first alerted to the possibility of consecutive sentencing at the plea submission hearing. He then revised that testimony and said that he recalled a meeting with trial counsel and the petitioner's step-father when counsel mentioned that the trial judge could "stack" the sentences but that counsel did not think stacking the sentences was likely.

The state further asked the petitioner if he had discussed with the presentence investigator moving to Colorado because the supervision of sex offenders in that state was not as stringent as Tennessee or Florida. He answered , "[T[hat's not exactly the way I told it." He related that he actually "told her that [he] had seen an internet report which made [him] believe that the sex offender requirements may not be as stringent there as they are in Florida. Would she – would she mind checking that out for [him]?" The petitioner was aware that the presentence investigator found him to be a high risk candidate for probation and so indicated in the presentence report. That report, the state pointed out, was prepared and filed prior to the polygraph and psychological evaluation.

The state called the petitioner's trial counsel who testified that the petitioner was always "very cooperative and very attentive and very interested in his case." Counsel related that he had known the trial judge assigned to the petitioner's case for many years, going back to the time when the judge was in private practice. As a result, trial counsel was very familiar with how the judge maintained his court and conducted court business.

Trial counsel explained that through his investigation he became concerned that the initial charges could escalate to rape charges. In the course of the preliminary hearing, trial counsel was able to examine the victim and to elicit her testimony that all of the encounters were consensual, thereby limiting the petitioner's criminal liability. Even so, trial counsel testified that the state's evidence regarding statutory rape charges was "overwhelming," and in his opinion, "the statutory rape charges were not defensible."

The state summarized each complaint that the petitioner had registered about trial counsel's services and performance. Trial counsel denied that the petitioner conveyed to him any concern that his statements to the police had been coerced because he was under a "hold." Trial counsel said that he questioned the petitioner about the circumstances under which the statements were made, and counsel discerned no basis to challenge the statements. Indeed, counsel recalled that the petitioner told him that he "felt like [he] just needed to tell the truth, and that's what [he] did."

Trial counsel explained that the petitioner provided no basis to suggest that the police used threats or force to enter the motel room. From the petitioner's responses, trial counsel was satisfied that the petitioner had consented to the entry. In terms of challenging the arrest warrants, counsel said that the petitioner could have been disadvantaged had the warrants been dismissed because a preliminary hearing would have been pre-empted. Counsel examined the indictment that was ultimately forthcoming, and counsel testified that he discerned no constitutional or statutory challenges that could have been pursued.

The state inquired at length about the plea submission. Trial counsel testified that given the strength of the state's case, the preferable option to pursue was an agreed plea. Counsel said that he and the petitioner discussed a plea "many, many times." They also discussed the statutory punishment available for each charge, and trial counsel recalled that he specifically advised the petitioner about the trial judge's approach to sentencing. Counsel recalled that part of the difficulty with plea negotiations stemmed from the media attention on the case because of the

internet involvement. As a result, prosecution counsel communicated to the petitioner's counsel that it would be difficult to make an offer that did not include substantial jail time.

Counsel testified that he was hopeful that the petitioner would receive split-confinement, although counsel advocated probation and judicial diversion before the trial court. Counsel explained that he wanted to portray the petitioner as a family man with children who loved him and with a strong employment background and as a person with no prior felony conviction. Counsel wanted to portray the situation "as an aberration and not the true [petitioner]." Problems began, however, with the presentence report. Counsel described the report as a "shock" to him, particularly the part involving the petitioner's conversation with the presentence investigator about moving to Colorado to obtain more lenient supervision. The next problem arose when the petitioner was arrested in Florida and made damaging statements to the investigating detective, who later came to Tennessee and testified at the sentencing hearing. Counsel testified that he knew of no basis to object to the introduction of the damaging evidence at sentencing.

Trial counsel portrayed his relationship with the assistant district attorney as friendly but professional – nothing that created any conflict with counsel's representation of clients.[2]

On cross-examination, counsel was asked about details relating to the petitioner's arrest, his efforts to make bail, and his subsequent statements to the police. Counsel pointed out that he was not retained by the petitioner until "after he had been released, after statements had been given, after all of these events had occurred." Counsel testified that he knew of no basis to challenge the petitioner's statement as coerced. Counsel said that he "was faced with what appeared to be an executed, valid *Miranda* warning and a subsequent statement confessing to the charges."

Counsel was certain that he had discussed the psychological and polygraph examinations with the petitioner before the pleas were entered because the petitioner was extremely concerned with having to register as a sexual offender and with the attendant supervision. Counsel surmised that the examinations were delayed because the parties incorrectly assumed that a probation officer would handle the scheduling. Counsel did not anticipate any problems with the polygraph examination; counsel said that he had previously cautioned the petitioner that he needed to disclose "anything out there that [counsel did not] know about that could hurt [the petitioner]." Counsel insisted that he thoroughly investigated the case. He added that had he known that the petitioner "would be arrested in Florida and charged with these acts that later came out to be devastating before entering the plea, [counsel] probably would have done a number of things differently." Even so, counsel did not believe that the sentencing outcome would have changed.

At the conclusion of counsel's testimony, the trial court took the matter under advisement pending submission of briefs of the parties. Thereafter, on August 24, 2004, the court

[2] The state moved the court during the hearing to strike the petitioner's claim regarding trial counsel's alleged conflict of interest. The court granted the motion citing a complete lack of evidence to support the claim, and the petitioner has not appealed that ruling.

-11-

issued a written memorandum and order denying the petition for post-conviction relief.[3] In its ruling, the post-conviction court demonstrated a thorough understanding of the procedural mechanics and the substantive legal principles that apply in the post-conviction arena. In pertinent part, the court found (1) that the petitioner's inculpatory statement to the police was made freely and voluntarily; (2) that the petitioner made a free and voluntary choice to enter into a blind plea; (3) that the search was done with the permission of the petitioner and/or the minor; (4) that the petitioner failed to disclose to his attorney information regarding his prior sexual history, thereby hindering counsel in advising the petitioner about the required evaluations; and (5) that the petitioner received effective assistance of counsel in connection with his consecutive sentencing and the appeal thereof.

It is well settled that the burden is on the petitioner, in a post-conviction proceeding, to prove his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). On appeal, the post-conviction court's findings of fact are given the weight of a jury verdict and are conclusive unless the evidence preponderates against them. *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). In this case, we agree with the post-conviction court's findings, and the evidence in no way preponderates against these findings. They rest in substantial measure on credibility assessments that the trial court made, and we will not second guess those determinations. Accordingly, it is unnecessary for us to belabor each and every detail.

When a post-conviction petitioner seeks relief on the basis of ineffective assistance of counsel, he must establish that the service rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Also, he must show that the deficiencies "actually had an adverse effect on the defense." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). There must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068; *see Best v. State*, 708 S.W.2d 421, 422 (Tenn. Crim. App. 1985). Should the petitioner fail to establish either factor, he is not entitled to relief.

This two-part standard of measuring ineffective assistance of counsel also applies to claims arising out of a guilty plea. *See Hill v. Lockhart*, 474 U.S. 52, 58, 106 S. Ct. 366, 370 (1985). The prejudice component is modified such that the defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59, 160 S. Ct. at 370; *see also Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998). Even so, as the Supreme Court explained in *Hill v. Lockhart*,

> In many guilty plea cases, the "prejudice" inquiry will closely
> resemble the inquiry engaged in by courts reviewing
> ineffective-assistance challenges to convictions obtained through a
> trial. For example, where the alleged error of counsel is a failure to

---

[3] The appellate record contains an amended order that was filed on September 20, 2004. That order appears, for all practical purposes, to duplicate the contents of the August 24, 2004 order. The record does not indicate why the amended order was filed, and we attach no procedural or substantive significance to it.

investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial. Similarly, where the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the "prejudice" inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.

474 U.S. at 59, 106 S. Ct. at 370-71.

The scrutiny of counsel's performance must be "highly deferential," and the reviewing court must refrain from concluding that a particular act or omission of counsel was unreasonable merely because the strategy employed was unsuccessful. *See Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. "A fair assessment," the United States Supreme Court has said, entails making every effort to "eliminate the distorting effects of hindsight" and evaluating the "conduct from counsel's perspective at the time." *Id*., 104 S. Ct. at 2065. The court promulgated a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*., 104 S. Ct. at 2065. The court added:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

*Id*. at 690-91, 104 S. Ct. at 2066.

## I. Ineffective Assistance of Counsel

*A. Failure to Challenge Inculpatory Statement*

In his brief, the petitioner presses his claim that trial counsel performed deficiently in not filing and pursuing a motion to suppress his inculpatory statement made to the police after he had invoked his right to counsel at the motel when he was arrested. He asserts that had counsel pursued a suppression motion, he would not have pleaded guilty because even if the motion had been denied, he could have pursued the issue on appeal.

-13-

During the evidentiary hearing, the trial court commented that it believed that the petitioner had requested trial counsel to file a suppression motion. Whether counsel rendered deficient services that prejudiced the petitioner on this matter, therefore, depends on the merit of the underlying motion. That is, to prevail on his claim, the petitioner must demonstrate that the motion was meritorious. *See Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 2583 (1986) (where failure to litigate suppression is basis of ineffectiveness claim, defendant must also prove suppression motion is meritorious); *Gary Randall Yarnell v. State*, No. E2004-01762-CCA-R3-PC, slip op. at 6 (Tenn. Crim. App., Knoxville, Aug. 15, 2005). Inasmuch as the trial court found in its order that the petitioner's statement was made freely and voluntarily, the court implicitly concluded that the statement could not have been successfully challenged had a suppression motion been filed. We agree with this assessment.

As we understand the petitioner's main argument, he claims that his inculpatory statement was coerced because after his stepfather posted bond on the charge of contributing to the delinquency of a minor, the police refused to release him in light of a "hold" placed on him by Detective Johnson. In addition, the petitioner argues that his detention on the statutory rape charges for nearly 48 hours before a probable cause determination was made requires suppression of his statement pursuant to *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S. Ct.1 661 (1991); *State v. Huddleston*, 924 S.W.2d 666 (Tenn. 1996), and Tennessee Rule of Criminal Procedure 5(a).

Factually, the defendant's reliance on *McLaughlin*, *Huddleston* and Rule 5(a) is misplaced. *McLaughlin* dealt with the Fourth Amendment requirement of a prompt judicial determination of probable cause as a prerequisite to any extended restraint of liberty after a warrantless arrest. The *McLaughlin* Court concluded that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of [the Fourth Amendment]." 500 U.S. at 56, 111 S. Ct. at 1670. Even so, a probable cause hearing within 48 hours may, nevertheless, run afoul of the Fourth Amendment "if the arrested individual can prove that his or her probable cause determination was delayed unreasonably." *Id*. at 56, 111 S. Ct. at 1670. Subsequently, in *Huddleston*, our supreme court ruled that the exclusionary rule applies in the context of a *McLaughlin* Fourth Amendment violation. 924 S.W.2d at 673.

We begin by noting that the petitioner was lawfully arrested and taken into custody at the motel on February 7, 1998. An arrest warrant for contributing to the delinquency of a minor was served on the petitioner that same day, shortly after his warrantless arrest. The following day, February 8, the petitioner's stepfather posted bond. Because of Detective Johnson's "hold," the defendant was not released at that time, and the petitioner initiated contact with Detective Johnson. On the morning of February 9, the petitioner then gave his incriminating statement, and arrest warrants for statutory rape were served on him later that same day. It therefore appears from the evidence that the statement sought to be suppressed was given approximately 42 hours after his initial arrest and less than 24 hours after bond was posted on the contributing to the delinquency of a minor charge. We discern from the petitioner's brief on appeal that he does not disagree with that assessment, which falls well within the *McLaughlin* 48-hour window of time. Rather, he argues that

the approximately 48 hour delay between the time he was initially arrested on February 7 and the probable cause determination on the statutory rape charges on February 9 was unreasonable.

We are unpersuaded, in the first instance, that the temporal distance between the February 7 arrest at the motel and the February 9 arrest warrants for statutory rape is the appropriate time frame in this case to consider. The point at which any police delay could even arguably be considered "unreasonable" did not occur until February 8, when Detective Johnson's "hold" prevented the petitioner's release. *See Huddleston*, 924 S.W.2d at 674 ("Unlike illegal arrest cases, the Fourth Amendment violation in *McLaughlin* cases is the unreasonable detention of an arrestee without a judicial determination of probable cause. Initially, detention is not illegal, but later ripens into a constitutional violation."). Moreover, at that point, the only probable cause determination to be made related to the statutory rape charges; a probable cause determination had already been made on the misdemeanor offense. The petitioner then confessed within 24 hours, and a probable cause determination, via the statutory rape warrants, occurred slightly more than 24 hours after the "hold" was in place. *Cf. Huddleston*, 924 S.W.2d at 668 (both defendant's confession *and* the probable cause determination occurred approximately 72 hours after initial detention).

Furthermore, even if we adopt the petitioner's time frame, no *McLaughlin* violation occurred because not more than 48 hours had elapsed before a probable cause determination was made. Finally, we note that even if a *McLaughlin* violation had occurred, suppression was not required inasmuch as the confession was not obtained either by exploitation of or as a consequence of a Fourth Amendment violation. The confession, in other words, would not constitute "fruit of the poisonous tree." *See Huddleston*, 924 S.W.2d at 675 (adopting *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407 (1963)).[4]

As for Criminal Procedure Rule 5(a), it would not have provided a successful avenue to suppress the petitioner's confession. That rule provides,

> Any person arrested except upon a capias pursuant to an indictment or presentment shall be taken without unnecessary delay before the nearest appropriate magistrate of the county from which the warrant for arrest issued, or the county in which the alleged offense occurred if the arrest was made without a warrant unless a citation is issued pursuant to Rule 3.5. If a person arrested without a warrant is brought before a magistrate, an affidavit of complaint shall be filed forthwith. When an arrested person appears initially before a magistrate, the magistrate shall proceed in accordance with this rule.

---

[4] This application of the well-settled "fruit of the poisonous tree" doctrine appears in the recent opinion, *State v. Lawrence*, 154 S.W.3d 71, 78 (Tenn. 2005), holding that the exclusionary rule did not apply to evidence obtained before the detention exceeded 48 hours in duration.

-15-

Tenn. R. Crim. P. 5(a). The petitioner correctly recognizes in his brief that suppression is required for a Rule 5(a) violation only if the resulting statement is involuntary. *See Huddleston*, 924 S.W.2d at 670-71. After hearing the evidence at the post-conviction hearing, the trial court specifically concluded that "[t]here is no question that the petitioner's statement was made freely and voluntarily." We likewise believe that the alleged "unnecessary delay" does not suffice, without more, to demonstrate that the petitioner's statement was involuntary.

Secondarily, the petitioner attempts to show that his statement would have been suppressed because he requested an attorney at the time he was arrested. Admittedly, both the United States and Tennessee Constitutions recognize that when a suspect makes an unequivocal request for an attorney, all interrogation must cease. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 1884-85 (1981); *State v. Stephenson*, 878 S.W.2d 530, 545 (Tenn. 1994). When, however, the suspect himself initiates further conversation with the police, suppression is not required. *Edwards*, 451 U.S. at 484, 101 S. Ct. at 1884-85; *Stephenson*, 878 S.W.2d at 545. In this case, the post-conviction evidence clearly showed that the petitioner was the one who initiated further conversation with the police; thus, no constitutional violation occurred.

Inasmuch as a motion to suppress the petitioner's statement would not have been meritorious, the petitioner has failed to demonstrate that trial counsel provided ineffective assistance by not filing a suppression motion. The petitioner argues that the merit of the motion is not an issue; rather, he claims that the question is whether he would have pleaded guilty but for counsel's failure to raise the issue. This argument is not well taken. Whether the motion is meritorious is relevant. *See Kimmelman*, 477 U.S. at 375, 106 S. Ct. at 2583; *Gary Randall Yarnell*, slip op. at 6. Furthermore, as we quoted previously in this opinion, the Supreme Court in *Hill v. Lockhart* noted that "[i]n many guilty plea cases, the 'prejudice' inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial." 474 U.S. at 59, 106 S. Ct. at 370. Accordingly, even were we to assume that counsel's failure to file a suppression motion was deficient performance, it would be altogether appropriate to consider whether suppression of the petitioner's statement would have affected the outcome of a trial.

The victim's probable trial testimony clearly would have established beyond a reasonable doubt the elements of statutory rape and contributing to the delinquency of a minor. Had the petitioner testified, his suppressed statement could have been used for impeachment purposes to attack his credibility. *See generally Harris v. New York*, 401 U.S. 222, 225-26, 91 S. Ct. 643, 645-46; *State v. Hopper*, 695 S.W.2d 530, 538 (Tenn. Crim. App. 1985). The petitioner admitted in his post-conviction testimony that he could not "make a prediction as to what a jury would decide" had his confession been suppressed, and according to the petitioner, his theory of defense would have been that the victim was an "untruthful delinquent," even though he knew that "she would have been telling truth." Certainly, our confidence in the outcome had there been a trial is not undermined.

*B. Failure to Challenge Arrest Warrants*

The petitioner next assails trial counsel's representation on the basis that no motion was filed to dismiss the arrest warrants for statutory rape. The warrants, according to the petitioner, gave no information to show probable cause that he had committed the offenses charged. As we understand the petitioner's argument, he claims prejudice because a showing that the warrants were invalid would have meant that he was clearly held longer than 48 hours without a probable cause determination and that suppression of his statement to the police, in the petitioner's words, "would have been stronger."

Trial counsel explained his legal tactic for not challenging the arrest warrants; he wanted to examine the victim, under oath, at the preliminary hearing to head off a possible charge of rape. The tactic was eminently reasonable and proved to be successful. Clearly, counsel did not perform deficiently in this matter.

Consequently, we hold that the petitioner has failed to demonstrate deficient performance by trial counsel with resulting constitutional prejudice.

*C. Psychological Evaluation and Polygraph Examination*

The petitioner next criticizes trial counsel for failing to inform him about the psychological evaluation and the polygraph examination and failing to adequately discuss and discover the petitioner's sexual history. On appeal, he urges us to disregard trial counsel's testimony (1) that he was certain that he did talk to the petitioner about the examinations prior to the plea submission because of the petitioner's anxiety about the sex offender supervision requirements, (2) that he asked the petitioner about past allegations of sexual misbehavior, and (3) that he asked the petitioner if there was anything about his past or background, whether charged or uncharged, that counsel needed to know. The petitioner argues that the record does not support that counsel discussed the examinations with the petitioner.

In our opinion, the record adequately supports trial counsel's testimony and the post-conviction court's finding that the petitioner "himself hid this information regarding his prior history from his attorney." Pursuant to our well-settled standard of review, we will not disturb the post-conviction court's credibility finding and resulting rejection of this claim of ineffective assistance of counsel.

*D. Failure to Object to Psychological Evaluation and Polygraph Evidence*

The petitioner maintains that trial and appellate counsel were ineffective because they failed to object to the petitioner's submitting to a psychological evaluation and polygraph examination prior to sentencing, on the ground that the testing violated his right against self-incrimination. As we understand the petitioner's argument, he submits that had counsel apprised themselves of existing legal precedent, they could have successfully objected to the testing

beforehand or any use of the information afterwards, and the length of the sentences and manner of service would have been more favorable to the petitioner.

To address this issue, we begin by attempting to identify what information the petitioner is claiming was improperly used at sentencing. In his opening and reply briefs on appeal, the only specific references are to the psychological evaluation and to the testimony of the polygraph operator, Jim Morris. The record on appeal does not contain a copy of the sentencing hearing transcript, nor is the psychological evaluation included. This court's opinion on direct appeal does describe Mr. Morris' testimony in the following fashion:

> The [petitioner] admitted to Mr. Morris that when he was 25 years old, he fondled his seventeen year old sister. The [petitioner] admitted that he had paid for the services of prostitutes on multiple occasions, and on one occasion the prostitute was a minor. The [petitioner] recalled that when he was 38 years old, he fondled another minor female, who was fifteen years old at the time.

*Wayne Michael Fuller*, slip op. at 4. Inasmuch as the petitioner does not, in connection with this issue, refer to the sentencing testimony of Florida Officer Legall or to the portion of the presentence investigation report regarding the petitioner's questions about transferring his supervision to Colorado, we need not discuss those matters in terms of the Fifth Amendment.

The petitioner directs our attention to *Mitchell v. United States*, 526 U.S. 314, 316-17, 119 S. Ct. 1307, 1309 (1999), wherein the Supreme Court ruled that neither a defendant's guilty plea nor statements at the plea colloquy function as a waiver of the right to remain silent at sentencing and that the sentencing court cannot draw an adverse inference from a defendant's silence in determining the facts relating to the circumstances and details of the crime. The petitioner posits that although *Mitchell* was decided after he had been evaluated, counsel should have foreseen the principal announced in *Mitchell*; alternatively, counsel could have moved after *Mitchell* was decided to exclude the information in connection with sentencing.

In our opinion, the petitioner miscasts his argument. First, *Mitchell* does not support the proposition that a defendant can invoke the privilege against self-incrimination after the fact. In *Mitchell*, the defendant neither testified nor offered any evidence at sentencing. The sentencing court then improperly drew adverse inferences from the defendant's failure to testify, which the Supreme Court held was impermissible. *Mitchell*, in other words, did not disturb the principal that the Fifth Amendment privilege against self-incrimination is not self-executing, and an individual must claim the privilege against self-incrimination in response to specific questions if he desires the protection of the privilege. *See Roberts v. United States*, 445 U.S. 552, 559, 100 S. Ct. 1358, 1364 (1980).

Second, in our opinion, the more pertinent inquiry via trial counsel's representation concerns why he did not consider and/or advise the petitioner to assert a privilege against self-

-18-

incrimination. There is no evidence that trial counsel was unfamiliar with the privilege against self-incrimination.[5] The post-conviction court concluded from the testimony that the petitioner "hid . . . information regarding his prior history from his attorney thus making it difficult for his attorney to properly advise him with regard to [the] evaluations." The evidence does not preponderate against this finding.

This case would be far different had the petitioner made a full disclosure to trial counsel who then took no action to protect the petitioner's interests. As matters actually stood, however, trial counsel was not alerted to any lurking self-incrimination problems. Admittedly, trial counsel was aware of his client's unfortunate conversation with the presentence investigator regarding Colorado. However, trial counsel described the petitioner as one of the most cooperative and interested clients that counsel had ever represented, and counsel specifically testified that he did not anticipate any problems with the polygraph examination. Counsel also testified that he had previously warned the petitioner to disclose "anything out there that [counsel did not] know about that could hurt [the petitioner]." Counsel added that had he known, for example, before the plea submission, that the petitioner would be arrested in Florida, counsel "probably would have done a number of things differently."

We are mindful of the Supreme Court's observation in *Strickland* that

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

466 U.S. at 691, 104 S. Ct. at 2066. Consequently, in our opinion, the petitioner has failed to demonstrate deficient performance by either trial or appellate counsel in connection with this claim.

Moreover, even had counsel been able to exclude the evidence to which the petitioner objects, the petitioner has not shown that his sentence would have been more favorable. The petitioner argues that all he had to show was that "he would not have entered a blind guilty plea if

---

[5] In his brief, the petitioner writes, "At the post conviction hearing defense counsel testified he was unaware of any legal basis to object to the polygraph and the psychological evaluation." Our review of the transcript discloses that at one point on direct examination, trial counsel commented that to object to the polygraph would have been futile. Later, on cross-examination by the petitioner's counsel, trial counsel was asked whether a defendant had a right to object to a polygraph based on the right against self-incrimination. He replied,

> I think that's certainly an argument that . . . anyone could make under the Fifth Amendment. Would it have been successful? Perhaps you can tell me. . . . I've not ever had to make that argument before, and I'm not sure it would have been successful. But you've got to understand, you try your cases based upon and you make your decisions based upon the information that you have at the time.

he had known the state could not force him to divulge his sexual history, and then use that information against him." This argument is flawed in two respects. The state had no ability "to force" the petitioner to divulge his sexual history; the petitioner could have invoked his right against self-incrimination. That the petitioner did not do so is attributable to his own conduct, not that of his attorney. Additionally, by his argument, the petitioner implicitly contends that he would have entered the guilty plea had he known his sexual history would not be divulged. Accordingly, it is relevant to consider whether his sentence would have been more favorable under those circumstances. We think not. The sentencing court would have had before it the presentence investigator's assessment that the petitioner was a high risk candidate for probation, particularly in light of the petitioner's remarks about the supervision requirement in Colorado. In addition, the facts regarding the petitioner's arrest in Florida and his subsequent inculpatory statements would have remained for the court's consideration. We are not in the least persuaded that the petitioner's sentence would have been more favorable.

## II.  Blakey v. Washington

As an independent claim, the petitioner argues that the trial court's application of enhancement factors without the participation of a jury violated his right to jury trial as explicated in *Blakely v. Washington*, 542 U.S. 296, 124 S. Ct. 2531 (2004). The Tennessee Supreme Court, however, has determined that Tennessee's scheme for the trial judge's use of enhancement factors to sentence a defendant to more than the minimum sentence does not infringe upon the defendant's right to trial by jury as described in *Blakely*. *See State v. Gomez*, 163 S.W.3d 632, 658-62 (Tenn. 2005). Therefore, the petitioner's claim, based on *Blakely*, is not well taken.

## III.  Consecutive Sentencing

This case is the third appeal in which the petitioner has complained about the consecutive service of five of his convictions. The petitioner's complaint on direct appeal of his convictions and sentence was rejected. *State v. Wayne Michael Fuller*, No. E1999-01676-CCA-R3-CD (Tenn. Crim. App., Knoxville, Aug. 16, 2000). The petitioner later brought a *habeas corpus* action attacking the consecutive sentencing as illegal and, therefore, void. That claim was also rejected. *Wayne Michael Fuller*, No. E2004-01642-CCA-R3-HC (Tenn. Crim. App., Knoxville, July 14, 2005). On this occasion, the petitioner complains about the consecutive sentencing in terms of appellate counsel's failure to argue that the trial court made no findings supporting consecutive sentencing, such that the trial court's decision was not entitled to a presumption of correctness. In terms of prejudice, the petitioner asserts that "[h]ad the appellate court not erroneously applied the presumption of correctness, they [sic] would not have upheld the consecutive sentencing."

In our opinion, appellate counsel's representation was not deficient. Even in the absence of a specific argument regarding our standard of review of sentencing decisions, this court invariably considers which type of *de novo* review is being applied to a sentencing decision. In this case, simply stated, under either form of *de novo* review – with a presumption of correctness or

without the presumption – the petitioner's consecutive sentencing was reasonable and appropriate.

We therefore reject this claim.

## IV. Conclusion

Now having given due consideration to the petitioner's appeal of the denial of post-conviction relief, we affirm the trial court's ruling.

_____
JAMES CURWOOD WITT, JR., JUDGE